

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1835 | **DATE** | 3/6/2001 |
| **CASE TITLE** | Thomas M. Hupp vs. The Metromail Corp. Special Severance Plan | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [28-1] is granted. Plaintiff's motion for summary judgment on his verified amended complaint [31-1] is denied. Judgment is entered in favor of the defendant The Metromail Corporation Special Severance Plan and against plaintiff Thomas M. Hupp. This case is dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

| RO | courtroom deputy's initials |
|---|---|

number of notices 2

MAR 07 2001
date docketed

docketing deputy initials

MAR 0 7 2001
date mailed notice

mailing deputy initials

FOR DOCKETING
MAR -6 PM 3:04

Date/time received in central Clerk's Office

Document Number

46

THOMAS M. HUPP,               )
                           )
     Plaintiff,             )
                           )     **No. 00 C 1835**
     v.                  )
                           )     **Judge Ruben Castillo**
THE METROMAIL CORPORATION   )
SPECIAL SEVERANCE PLAN,      )
                           )
     Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas M. Hupp ("Hupp") sues Defendant Metromail Corporation Special

Severance Plan (the "Plan") pursuant to § 502(a)(1)(B) of the Employment Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Specifically, Hupp seeks severance benefits

that he claims are due him under the Plan but were denied him by the administrators of the Plan.

On July 27, 2000, this Court denied Defendant's motion to dismiss. *Hupp v. Experian Corp.*,

108 F. Supp. 2d 1008 (N.D. Ill. 2000). The parties' cross-motions for summary judgment are

presently before the Court. For the reasons set forth below, we grant summary judgment for

Defendant and deny Plaintiff's motion.

**DOCKETED**

### RELEVANT FACTS

MAR 0 7 2001

**I. The Plan**

In July 1997, the Metromail Corporation ("Metromail") adopted its Special Severance

Plan. The Plan is governed by ERISA and has the stated purpose of retaining certain employees

by providing them with economic security "in the event of a Severance of employment." (R. 29-

2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 9, Special

Severance Plan Preamble.) Section 1.19 of the Plan defines "Severance," in part, as the termination of an employee for "Good Reason" within two years following a "Change in Control." (*Id.*, Special Severance Plan § 1.19.) Termination for "Good Reason" is defined as "a change in the Employee's duties or responsibilities in the nature of a demotion (other than for Cause or other than a voluntary change)." (*Id.*)

## II. Hupp's Employment with Metromail

In May 1997, Hupp was hired by Metromail as Vice President of Operations and Technology of its On-Line Services business unit ("OLS") with responsibility for three product lines: ICS, MEC and NDA. Each of the three product lines had eight sub-categories of operations and technology over which Hupp had control. Hupp reported to Pradhuling Patel, President of OLS. Hupp had four direct reports and his budgeted employee headcount was between sixty-five and seventy. The budgeted revenue generated by the OLS products under Hupp's control was $33.6 million. Hupp, however, had no revenue-generating responsibilities, and he was not responsible for the sales and marketing functions of the product lines. Hupp's salary at the time he was hired by Metromail was $135,000, and he had independent signing authority for expenditures up to $10,000.

## III. The Change in Control

In April 1998, Experian acquired Metromail which, the parties agree, constituted a "Change in Control" under the Plan. Following its acquisition of Metromail, Experian restructured, integrating the existing Experian businesses with those of Metromail and another company acquired by Experian in the fall of 1997. Experian's restructuring efforts focused on centralizing support functions among the various business entities and integrating similar

businesses to maximize profitability. In May 1998, Experian placed ICS and MEC in a business

unit called Experian Information Solutions. In June 1998, Experian created a business unit called

"Telecommunications, Energy and Cable ("TEC"), which was designed to provide the full

spectrum of Experian products, including NDA, to TEC customers. The goal of TEC was to

increase the sales and profitability of all Experian products to customers in the industry.

## IV. Hupp's Employment with Experian

After the change in control, Hupp became a Vice President of Operations and Technology

within the TEC business unit of Experian. He continued to report directly to Patel, who was

named President of TEC. Hupp remained responsible for most of the operations and technology

functions of TEC, including the NDA product line, but Hupp no longer had responsibility for the

ICS and MEC product lines. Hupp had five direct reports but his budgeted employee headcount

was reduced to thirty. The budgeted revenue generated by the TEC products under Hupp's

control was $15.6 million. Just as before the change in control, Hupp had no direct revenue-

generating responsibilities. By March 1999, Hupp's salary had increased to $151,500, and his

independent signing authority for expenditures remained at $10,000.

In early 1999, Experian decided to sell the NDA business line. In addition to his other

duties as a TEC Vice President, Hupp served on the senior management team responsible for the

sale of NDA and participated in high level business discussions regarding the sale. Hupp,

however, denies that he was involved in the actual decision-making process to sell NDA. (R. 45,

Pl.'s Reply in Supp. of Pl.'s Additional Facts in Opp'n to Def.'s Mot. for Summ. J. ¶ 43.) This

sale was consummated in late November or early December of 1999.

In August 1999, Hupp met with Margaret Smith, President of the Experian Strategic

Solutions business unit, to talk about his future with Experian following the sale of NDA. In that meeting, Smith suggested, as a possibility, that Hupp might be offered a Chief Technology Officer position within Experian, a higher level position than Hupp then held. Smith and Hupp also discussed three options that would be available to Hupp with regard to his eligibility for severance benefits under the Plan: (1) remain with Experian through the sale of NDA plus a 120 to 150 day transition period thereafter and then receive payments under the Plan; (2) remain with Experian through the sale of NDA and the same 120 to 150 day transition period, accept a new position offered by Experian and forego Plan benefits; or (3) resign before the completion of the transition and forego Plan benefits. (R. 39-1, Pl.'s Resp. to Def.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J. ¶ 52.)

## V. Hupp's Claim for Severance Benefits under the Plan

On September 3, 1999, Hupp sent an email to Ann Sterling, in-house counsel for Experian, copied to Patricia Dever, Senior Vice President of Human Resources Management and Development for Experian and chair of the Claims Committee,[1] stating that he "plan[ned] to sever [his] employment [with Experian] for Good Reason as defined in paragraph 1.19[(ii)(Z)]" based on "the removal of the ICS and MEC development, Infrastructure, Help Desk, and Telecommunications groups from [his] responsibilities at the direction of Experian management." (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 10, Hupp email to Sterling).) Upon receipt of Hupp's claim for benefits, Dever took the

---

[1] Pursuant to § 3.3 of the Plan, the Claims Committee was delegated the duty to decide claims under the Plan. (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 9, Special Severance Plan § 3.3.) The other members of the Claims Committee are Mac Rodgers, President of Experian Marketing Solutions, and Douglas Sturgess, Vice President and Treasurer for Experian.

following steps: (1) she contacted Smith to investigate Hupp's claim and Smith told Dever that Experian wanted to find Hupp a comparable position following the sale of NDA; (2) she spoke with, among others, Patel, Hupp's direct superior at Experian, and Richard Petro, Director of Human Resources at Experian; (3) she spoke with Hupp and told him that Experian valued his talents and wanted him to remain with them; and (4) she and Smith spoke with Hupp regarding his claim and reiterated the three options Smith presented to him in August 1999.

On September 15, 1999, the Claims Committee denied Hupp's claim finding that, pursuant to § 1.19 of the Plan, "the change in [his] responsibilities does not meet the condition of a change in the Employee's duties or responsibilities in the nature of a demotion." (*Id.*, Tab No. 13, Claim Denial Mem.) The Claims Committee stated that "in order for [Hupp] to be eligible for the Plan, [he] would have to remain through the transition period and [Experian] would have to be unable to locate a comparable position for [him] within Experian." (*Id.*)

On October 19, 1999, pursuant to § 2.4 of the Plan, Hupp appealed the denial of his claim. Hupp stated in his appeal that, after the change in control, he was entitled to severance benefits for the following reasons: (1) his title was changed from Vice President of Operations and Technology of OLS to Vice President of Operations and Technology of NDA; (2) two product lines (ICS and MEC) were completely removed from his realm of responsibility and his responsibilities for a third product line (NDA) were reduced and would soon be eliminated entirely with its sale; (3) his budgeted headcount was reduced from between sixty-five and seventy to thirty; and (4) the budgeted revenue related to the products under his control was reduced from $33.6 million to $15.6 million. (*Id.*, Tab No. 14, Appeal of Denial.)

On February 18, 2000, after meeting to discuss Hupp's claim and conducting further

investigation, the Claims Committee denied Hupp's appeal, noting that: (1) Hupp was a "Vice President of Operations and Technology, both before and after Experian's acquisition of Metromail"; (2) any changes in Hupp's duties were the result of "a routine realignment of business responsibilities following a change in corporate structure . . . made for business reasons"; (3) "not all Vice Presidents can have exactly the same number of subordinates and supervise product lines with identical revenues"; and (4) "Hupp continued to participate in all corporate decision-making at the level of Vice President and continued to earn identical compensation." (*Id.*, Tab No. 25, Pl.'s Verified Am. Compl. and Attached Exs.) Therefore, the Claims Committee found that any changes to Hupp's duties following the change in control "were lateral adjustments and did not constitute a demotion." (*Id.*) Finally, the Claims Committee pointed out that because Hupp continued in his position for almost one and a half years following the change in control, any changes to Hupp's duties "were voluntary and did not satisfy the criteria set forth in Clause (Z) of the definition of Good Reason set forth in § 1.19 of the Plan," which excepts a voluntary change from the definition of "Good Reason." (*Id.*, Tab No. 9, Special Severance Plan § 1.19.)

Presently before this Court are the parties' cross-motions for summary judgment. Hupp argues that this Court should apply a *de novo* standard of review of Defendant's denial of severance benefits and that, under this standard, Defendant's decision is incorrect. Alternatively, Hupp argues that, even under an arbitrary and capricious standard of review, he is entitled to severance benefits because Defendant's decision is unreasonable. Defendant, on the other hand, urges this Court to apply an arbitrary and capricious standard of review and argues that its decision to deny severance benefits to Hupp is neither unreasonable under this standard nor

incorrect under a *de novo* standard of review. Applying an arbitrary and capricious standard of review, we find that Defendant's denial of severance benefits under the Plan is not unreasonable. Therefore, we grant summary judgment for Defendant and deny Plaintiff's motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all evidence in a light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party. *Id.* at 255. However, if the evidence is merely colorable, or is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When both parties seek summary judgment, the court will "look to the burden of proof that each party would bear on an issue at trial; [the court] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## ANALYSIS

### I. Standard of Review

In analyzing an ERISA claim under § 1132(a), we must first determine the appropriate standard of review. The Supreme Court set forth the applicable basic rule in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989). In *Firestone*, the Court explained that *de novo*

review of an ERISA plan administrator's determination to deny benefits is the default rule "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. *See also Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan v. Wells*, 213 F.3d 398, 403 (7th Cir. 2000) (presumption against deference); *Hertzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000) (conferral of discretion not to be assumed). Where a plan confers discretionary power on the plan administrator to interpret the plan, the arbitrary and capricious standard governs and our review is deferential. *See, e.g., Wilczynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 988, 934 (7th Cir. 1999); *Mers v. Marriot Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998).

To determine whether a plan grants discretion to its administrator, we must look to the language of the plan. *See Hertzberger*, 205 F.3d at 329. While a plan is not required to have language specifically conferring discretionary authority on the plan administrator, the language must express with sufficient clarity that discretionary authority has been assumed by the plan. *Id.* at 331-32 (no "magic words" required to confer discretion but statement regarding plan's authority to "determine" employee's eligibility for benefits "implies nothing one way or the other about the scope of judicial review" and does not give employee sufficient notice that plan administrator has discretionary power largely insulated from judicial review). Determinations of benefits "that supervene on interpretation of key terms . . . invite the exercise of discretion, being inescapably particularistic and fact-bound." *Wal-Mart*, 213 F.3d at 403.

In this case, the Plan language clearly "confers upon the administrator a power of discretionary judgment" and this Court "can set it aside only if it was 'arbitrary and capricious,'

8

that is unreasonable, and not merely incorrect." *See Hertzberger*, 205 F.3d at 329. Section 3.1 of

the Plan states that the Plan Administrator "shall have authority, subject to the provisions of the

Plan, to determine who shall be eligible for Severance Pay, to interpret the Plan . . . and to make

all other determinations necessary or advisable for the administration of the Plan."[2] (R. 29-2,

App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 9, Special

Severance Plan § 3.1.) Section 3.2 states that all questions of interpretation "shall be settled and

determined by the Plan Administrator . . . . Any such settlement and determination shall be final

and conclusive . . . ." (*Id.*, Special Severance Plan § 3.2.)

When language granting such broad authority is vested in the Plan Administrator, the

Seventh Circuit has consistently held that the appropriate standard of review is the "arbitrary and

capricious" standard. *See, e.g., Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001,

1008 (1998) (arbitrary and capricious standard applies to plan which states that "[t]he Plan

---

[2] The pertinent provisions of the Plan are §§ 3.1 and 3.2.

Section 3.1:
> The Plan shall be interpreted, administered and operated by the Plan Administrator, who shall have the authority, subject to the provisions of the Plan, to determine who shall be eligible for Severance Pay, to interpret the Plan, to prescribe, amend and rescind rules and regulations relating to it, and to make all other determinations necessary or advisable for the administration of the Plan.

Section 3.2:
> All questions of any character whatsoever arising in connection with the interpretation of the Plan or its administration or operation shall be settled and determined by the Plan Administrator in an equitable and fair manner in accordance with the procedure for claims and appeals described in Section 2.4. Any such settlement and determination shall be final and conclusive, and shall bind and may be relied upon by the Employer, each of the Employees and all other parties in interest. (*Id.*, Special Severance Plan §§ 3.1-3.2.)

Administrator shall have the right to interpret the terms and provisions of the Benefit Plan and to determine any and all questions arising under the Benefit plan or in connection with the administration of the Benefit Plan . . . ."); *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107 (1998) (MetLife "determines conclusively for all parties all questions arising in the administration of the Program and any decision of the insurance company is not subject to further review"). Hupp argues that the Plan "fails to clearly stipulate deferential review, rather it merely describes *who* (Plan Administrator) should decide eligibility rather than the extent of the Administrator's power." (R. 40, Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 7-8.) We disagree. The Plan confers upon the administrator the "authority . . . to determine who shall be eligible for Severance Pay, to interpret the Plan . . . and to make all other determinations necessary or advisable under the Plan." (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 9, Special Severance Plan § 3.1.) Furthermore, the Plan states that all determinations of the Plan Administrator "shall be final and conclusive, and shall bind and may be relied upon by the Employer, each of the Employees and all other parties in interest." (*Id.*, Special Severance Plan § 3.2.) This language describes much more than *who* decides eligibility. Rather, it clearly stipulates deferential review under the arbitrary and capricious standard by granting broad powers of interpretation and determination to the Plan Administrator.[3]

---

[3] Additionally, we note that determinations that supervene on interpretation of key terms in § 1.19 of the Plan such as "Cause," "Good Reason" and whether a particular job change was in the "nature of a demotion" or was "voluntary" invite the exercise of discretion, "being inescapably particularistic and fact-bound." *See Wal-Mart*, 213 F.3d at 403. Moreover, we agree with Defendant that, consistent with the prescription in *Hertzberger* that employees should "know what they're getting into," the Plan language clearly informs employees that the Plan grants broad discretion to the Plan Administrator to decide claims and appeals. *See Hertzberger*, 205 F.3d at 332-33. For all of these reasons, we proceed to review Defendant's denial of severance benefits to Hupp under the arbitrary and capricious standard.

## II. Denial of Severance Benefits under the Plan

While the arbitrary and capricious standard is "the least demanding form of judicial review," *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996), and our review of the plan administrator's decision is "extremely deferential," *Cozzie*, 140 F.3d at 1107, it "is a review and not a rubber stamp," *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994). However, as long as the plan administrator makes an "informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, *i.e.*, one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached," the benefits decision will be upheld. *Exbom v. Cent. States, Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir. 1990). Thus, we do not interfere with the plan administrator's decision, even if it is not the result we would have arrived at in the first instance, unless the administrator "not only made the wrong call, but . . . a 'downright unreasonable' one." *Chojnacki v. Ga.-Pac. Corp.*, 108 F.3d 810, 816 (7th Cir. 1997). *See also James v. Gen. Motors Corp.*, 230 F.3d 315, 316-17 (7th Cir. 2000) (explaining that the court's role is limited and "it is hard to overturn a decision of a plan administrator").

Under the arbitrary and capricious standard, we evaluate several factors including: (1) the impartiality of the decisionmaking body; (2) the complexity of the issues; (3) the process afforded the parties; and (4) the soundness of the plan administrator's ratiocination. *See Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995) (citing *Exbom*, 900 F.2d at 1142). Hupp contests the first, third and last of these factors.

### A. Impartiality of the Claims Committee

11

As the Supreme Court noted in *Firestone*, although the existence of a conflict of interest on the part of the plan administrator does not alter the applicable standard of review, that conflict must be weighed as a factor in determining whether there has been a breach of duty even under the arbitrary and capricious standard. *Firestone*, 489 U.S. at 115. We presume, however, that an administrator is acting neutrally unless the plaintiff shows, by providing specific evidence of actual bias, that there is a significant conflict. *Mers*, 144 F.3d at 1020.

Hupp argues that any deference to which the plan administrator is entitled should be limited because the record "clearly demonstrates bias in the manner of formation of the Claims Committee, the method of operation of the Claims Committee, and its rubber stamp denials of severance benefits under § 1.19(ii)(Z) of the Plan." (R. 40, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 11.) We disagree. First, with regard to the manner of formation of the Claims Committee, the record does not demonstrate any bias. Section 1.15 of the Plan defines "Plan Administrator" as the Human Resources Committee of the Board of Directors of the Company. (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 9, Special Severance Plan § 1.15.) Section 3.3 of the Plan allows the plan administrator to delegate his or her duties to such person(s) as he or she may choose. (*Id.*, Special Severance Plan § 3.3.) Prior to the change in control, the Human Resources Committee of the Board of Directors of Metromail was the plan administrator. After the change in control, the responsibility for plan administration was delegated to the Claims Committee. Hupp's assertion that Dever, the Claims Committee chairman, had no independent knowledge of who the plan administrator was prior to the change in control and could not explain how the Claims Committee was designated to decide appeals under the Plan, does not constitute specific evidence of bias in the formation of the

Claims Committee nor in the delegation of plan administration duties to the Claims Committee.

Second, with regard to the method of operation of the Claims Committee, Hupp cites *Hogan v. Metromail*, 107 F. Supp. 2d 459 (S.D.N.Y. 2000) for the proposition that "[d]istributing severance benefits while simultaneously trying to maximize profits paves the way for a bias against granting benefits." *Id.* at 475. Assuming all of the plaintiff's allegations to be true in the context of a motion to dismiss, the *Hogan* court concluded that a conflict of interest "could have contributed" to a denial of benefits because the "Board" which served as the plan administrator was the same as the "Board" which was "primarily responsible for the maximization of profits." *Id.* The *Hogan* case is inapposite. Here, there is no evidence that the Claims Committee was "primarily responsible for the maximization of profits."[4] As such, we find no bias in the method of operation of the Claims Committee.

Finally, Hupp argues that the Claims Committee had a pattern of refusing to pay severance benefits under § 1.19(ii)(Z) of the Plan. Although Defendant could not identify any employees who were awarded benefits specifically under this section of the Plan and only two whose claims were denied under this section, it is undisputed that over fifty employees received benefits under the Plan in general following the change in control. (R. 29-1, Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J. ¶¶ 70-71.) This evidence clearly rebuts Hupp's assertion that the Claims Committee "rubber stamp[ed]" denials. Indeed, we note that such a

---

[4] The Seventh Circuit has held that corporate officers can "double" as plan administrators because "the impact on a company's welfare of granting or denying benefits under a plan will not be sufficiently significant as to threaten the administrator's partiality." *Chalmers*, 61 F.3d at 1344 (stating that a corporation which generates revenues of nearly $6 billion annually is not likely to flinch at paying out $240,000). Similarly, we do not believe that Hupp's claim to approximately $150,000 in severance benefits under the Plan would have a sufficient impact on Experian as to threaten the Claims Committee's partiality.

practice runs counter to the long term goals of a business by "dampen[ing] loyalties of current employees while hindering attempts to attract new talent." *Chalmers*, 61 F.3d at 1344. Therefore, we find that Hupp has failed to produce any specific evidence of bias on the part of the Claims Committee, and we conclude that the Claims Committee acted as an impartial plan administrator.

### B. Process Afforded Hupp

Deferential review of an administrative decision means review on the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) (holding that, where there is no doubt that a benefits application was given a genuine evaluation, review is limited to the evidence submitted in support of the application, and the mental processes of the administrator are not a legitimate ground of inquiry). Additional evidence, however, may be considered where the plan administrator "did not do what it said it did -- that, for example, the application was thrown in the trash rather than evaluated on the merits." *Id.* at 982. Here, Hupp argues that: (1) the Claims Committee reviewed no documents other than his original email claim and his appeal letter; (2) the denial of benefits was based entirely on Dever's discussions with Smith; and (3) the Claims Committee failed to consider an email sent by J.E. Treadway, Vice President of Human Resources of Metromail, to Experian management, which Hupp alleges clarified the definition of "demotion" under the Plan. We disagree and find that the Claims Committee afforded Hupp a full and fair process, conducting a genuine evaluation before denying Hupp's claim.

In this case, there are no written guidelines for the operation of the Claims Committee, other than the Plan itself. (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for

14

Summ. J., Tab No. 2, Dever Dep. at 36-37.) However, Dever described the evaluation process of the Claims Committee as follows: (1) all claims under the Plan must be reviewed by the Committee; (2) all questions of interpretation must be reviewed by the Committee; (3) the Committee meets at every level of a claim appeal; and (4) the Committee conducts fact-finding where necessary, delegating responsibility for a particular claim to one or more members of the Committee. (*Id.* at 37, 46.) In this case, Hupp submitted his claim via email on September 3, 1999. Upon receipt of Hupp's claim, and before denying that claim in a detailed memorandum on September 15, Dever stated that she took the following steps: (1) she contacted Smith to investigate Hupp's claim and Smith told Dever that Experian wanted to find Hupp a comparable position following the sale of NDA; (2) she spoke with, among others, Patel, Hupp's direct superior at Experian, and Petro, Director of Human Resources at Experian, (3) she spoke with Hupp and told him that Experian valued his talents and wanted him to remain with them; and (4) she and Smith spoke with Hupp regarding his claim and reiterated the three options Smith presented to him in August 1999.

Hupp agrees that Dever met with Smith to investigate his claim and that Dever and Smith met with him to discuss his employment options. He maintains, however, that these actions did not constitute a genuine evaluation of his original claim. We disagree. In meeting with Smith, who was arguably the senior executive at Experian most familiar with the facts of Hupp's claim, and in meeting with Hupp to discuss his view of the facts, Dever heard both sides of a very fact-specific investigation. This is far short of "'throw[ing the application] in the trash' or some other, equally egregious, gross abuse of the decision-maker's duties" that would demonstrate a lack of genuine investigation. *Hughes v. Life Ins. Co. of N. Am.*, 112 F. Supp. 2d 780, 794-95 n.7

15

(S.D. Ind. 2000) (citing *Perlman*, 195 F.3d at 982).

On October 19, Hupp appealed the denial of his claim. Other than his September 3 email and his October 19 appeal letter, Hupp provided no information to the Claims Committee in support of his claim. Prior to denying Hupp's appeal in a February 18, 2000 letter which again set forth the reasons for the denial, the Claims Committee took the following steps: (1) the Committee met to discuss what information needed to be investigated and delegated fact-finding responsibilities to Dever; (2) Dever investigated Hupp's allegations by meeting with the other members of the Committee and by consulting Smith as well as Wayne Jacobsen, the Plan's outside counsel; and (3) the Committee met again, discussed the information gathered by Dever and made their "ultimate determination." (R. 45, Def.'s Reply to Pl.'s Statement of Facts in Opp'n to Def.'s Mot. for Summ. J. ¶ 54.) Again, Hupp contends that the only fact-finding done by Dever were her meetings with Smith to discuss his appeal, and that this was insufficient. Even when viewing the evidence in the light most favorable to Hupp, we must disagree with his contention.

Based on a careful review of the record, we find that there "can be no doubt" that Hupp's claim was given a genuine evaluation. *Perlman*, 195 F.3d at 981-81. The Claims Committee thoroughly investigated Hupp's original claim and appeal, as evidenced by the numerous steps (described above) that were taken by Dever and the Claims Committee. Therefore, our deferential review is properly limited to the evidence submitted in support of Hupp's claim, and we will not inquire into the "mental processes" of the Claims Committee.[5] *Id.*

---

[5] In support of his argument that there was no genuine evaluation of his claim, Hupp relies on the Treadway email, sent on April 27, 1998 to Experian management. The email states, in relevant part, that a "'change in the nature of a demotion' means that the employee is

16

## C. Soundness of the Claims Committee's Ratiocination

Our holding that the Claims Committee was impartial and that it afforded Hupp a genuine evaluation of his claim does not, however, lead to a speedy affirmance of its findings. We must now evaluate the Claims Committee's ratiocination and determine whether it acted in an arbitrary and capricious manner. The decision of the Claims Committee will not stand if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of [its] expertise.

*Gawrysh v. CNA Ins. Co.*, 8 F. Supp. 2d 791, 794 (N.D. Ill. 1998) (quoting *Motor Vehicles Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). *See, e.g., Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (holding that Blue Cross acted arbitrarily and capriciously in determining that an employee was not entitled to long-term disability benefits because Blue Cross decided that the employee could perform another job similar to her former job with Blue Cross without performing the "slightest inquiry" into the skills necessary to perform the other job and whether the employee possessed those skills). Thus, under this extremely deferential standard, we will not interfere with the Claims Committee's decision unless it was a "downright unreasonable" interpretation of the ERISA contract. *See*

---

adversely affected . . . by a significant reduction in responsibility that is comparable to a reduction in job grade even though the former job grade is left intact." (R. 31-3, App. to Aff. of Richard Petro, Ex. B.) Hupp asserts that this email, which the Claims Committee did not consider in its decision to deny his claim, would have provided a "key" clarification into whether Hupp's responsibilities after the change in control constituted a "demotion." Hupp also complains that the email was not properly produced by Defendant during discovery. Defendant, on the other hand, raises multiple hearsay objections. Because we do not believe that the email provides a "key" clarification, it does not affect our analysis of the process afforded Hupp nor our analysis of the Claims Committee's ratiocination under the arbitrary and capricious standard. Therefore, we need not rule on Defendant's hearsay objections.

*Chojnacki*, 108 F.3d at 816.

One of the core issues in this case is the parties' different interpretations of the phrase "change in the Employee's duties or responsibilities in the nature of a demotion." (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 9, Special Severance Plan § 1.19(ii)(Z).) This phrase is not defined in the Plan. Although the law of insurance contracts generally construes ambiguities in favor of an insured, this rule is inapplicable in the case at bar because the Plan gives the Claims Committee discretionary authority to interpret the Plan. *See Ross*, 159 F.3d at 1001. Nevertheless, an interpretation of a particular term contrary to the language of an ERISA plan is arbitrary and capricious. *See Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 and n.9 (1996) (if "administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious").

Hupp, not surprisingly, argues that the Claims Committee's denial of severance benefits was unreasonable and contrary to the language of § 1.19 of the Plan because his separation from the company was not voluntary but, instead, he was forced to resign following his demotion after the change in control. As evidence of his demotion, Hupp refers the Court to the following facts: (1) his title was changed from Vice President of Operations and Technology of OLS to Vice President of Operations and Technology of NDA; (2) two product lines (ICS and MEC) were completely removed from his control and his responsibilities for a third product line (NDA) were reduced and would soon be eliminated entirely with its sale; (3) his budgeted headcount was reduced from between sixty-five and seventy to thirty; and (4) the budgeted revenue related to the products under his control was reduced from $33.6 million to $15.6 million. (R. 29-2, App. to Def.'s Statement of Facts in Supp. of Def.'s Mot. for Summ. J., Tab No. 14, Appeal of Denial.)

The Claims Committee, however, found that Hupp's changed duties did not constitute a demotion. The Committee points out that: (1) Hupp was a "Vice President of Operations and Technology, both before and after Experian's acquisition of Metromail"; (2) any changes in Hupp's responsibilities were the result of "a routine realignment of business responsibilities following a change in corporate structure . . . made for business reasons"; (3) "not all Vice Presidents can have exactly the same number of subordinates and supervise product lines with identical revenues"; and (4) "Hupp continued to participate in all corporate decision-making at the level of Vice President and continued to earn identical compensation." (*Id.*, Tab No. 25, Pl.'s Verified Am. Compl. and Attached Exs.) Therefore, the Claims Committee determined that any changes to Hupp's responsibilities following the change in control "were lateral adjustments and did not constitute a demotion." (*Id.*)

Based on a careful review of the record, we believe that Defendant's denial of Hupp's claim was not an arbitrary and capricious decision under § 1.19 of the Plan. *See Chojnacki*, 108 F.3d at 816 (decision must be "downright unreasonable"). While there can be no doubt that Hupp's responsibilities were altered after the change in control, Hupp does not cite any caselaw, and our own independent research does not reveal any, to support his argument that Defendant's conclusion that these changes "did not constitute a demotion" was unreasonable and controverted the plain meaning of the Plan.[6]

Prior to the change in control, Hupp was Vice President of Operations and Technology of

---

[6] We emphasize that, even accepting the Treadway email clarification of the term "demotion" as a "significant reduction in responsibility that is comparable to a reduction in job grade even though the former grade is left intact," we do not overturn Defendant's decision that the changes in Hupp's duties did not constitute a demotion. (R. 31-3, App. to Aff. of Richard Petro, Ex. B.)

the OLS business unit of Metromail, with responsibility for three product lines: ICS, MEC and NDA. He reported to Pradhuling Patel, President of OLS. After the change in control, Hupp became a Vice President of Operations and Technology within the TEC business unit of Experian. Although Hupp no longer had responsibility for the ICS and MEC product lines, Hupp remained responsible for most of the operations and technology functions of TEC, including the NDA product line. Moreover, in addition to his other duties as a TEC Vice President, Hupp served on the senior management team responsible for the sale of NDA. He continued to report directly to Patel, who was named President of TEC. Although Hupp's budgeted headcount was reduced from between sixty-five and seventy to thirty, the number of his direct reports increased from four to five. Also, despite the fact that the budgeted revenue for the products under Hupp's control was reduced from $33.6 million to $15.6 million, it is undisputed that Hupp had no direct revenue-generating responsibilities either before or after the change in control. Finally, Hupp's salary had increased from $135,000 to $151,500, and his independent signing authority for expenditures remained at $10,000.

Given these facts and the deference we must accord to a plan administrator under the arbitrary and capricious standard, we believe that the decision of the Claims Committee to deny Hupp's claim for severance benefits, made after a genuine evaluation, was neither the product of bias nor unsupported by the evidence before it. Therefore, we grant summary judgment for Defendant and deny Hupp's motion.

## CONCLUSION

Hupp alleges that Defendant unreasonably denied his claim for severance benefits under the Plan. The evidence, however, clearly supports Defendant's contention that its decision to

deny Hupp's claim was not arbitrary and capricious. Therefore, Defendants' motion for summary judgment is granted. (R. 28-1.) Plaintiff's motion for summary judgment is denied. (R. 31-1.) The Clerk of the Court is directed to enter judgment pursuant to Fed. R. Civ. P. 58 in favor of Defendant and against Plaintiff.

Entered:

Judge Ruben Castillo
United States District Court

Dated: March 6, 2001